UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                     Case No. 22-cr-20200

v.

                                  HON. MARK A. GOLDSMITH

SHERIF KHALIL et al.,

        Defendants.

_____/

### OPINION & ORDER
### (1) DENYING DEFENDANTS' MOTIONS TO DISMISS COUNT ONE (Dkt. 78) AND COUNT TWO (Dkt. 79) AND (2) GRANTING NANCY HARRIS'S MOTION TO ADOPT SHERIF KHALIL'S MOTION TO DISMISS COUNT TWO AND MOTION FOR BILL OF PARTICULARS (Dkt. 81)

Before the Court are Defendants' motions to dismiss Count One (Dkt. 78) and Count Two

(Dkt. 79) of the amended indictment (Dkt. 18), as well as Nancy Harris's motion to adopt Sherif

Khalil's motion to dismiss Count Two and motion for a bill of particulars.[1]  For the reasons that

follow, the Court (i) denies Defendants' motions to dismiss Count One and Count Two and (ii)

grants Harris's motion to adopt Khalil's motion to dismiss Count Two and motion for bill of

particulars.[2]

_____

[1] Khalil filed motions to dismiss Count One and Count Two of the amended indictment.  Schroeder and Saad filed notices of joinder/concurrence in both motions (Dkts. 83, 84, 85).  Harris filed a motion to adopt Khalil's motion to dismiss Count Two and motion for bill of particulars.  The Government did not object to the joinder notices or oppose the motion to adopt.  The Court grants Harris's motion and treats the motion to dismiss Count One as if filed on behalf of Khalil, Schroeder, and Saad and the motion to dismiss Count Two as if filed on behalf of Khalil, Schroeder, Saad, and Harris.

[2] The briefing also includes the Government's response to Defendants' motions to dismiss Count One and Count Two (Dkt. 91), Defendants' reply in support of their motion to dismiss Count One (Dkt. 96), and Defendants' reply in support of their motion to dismiss Count Two (Dkt. 97).  The

## I.   BACKGROUND

In April 2022, a grand jury indicted Defendants Sherif Khalil, Ali Saad, Kurt Schroeder, Nagi Abdelsyed, and Nancy Harris on four counts of healthcare related offenses.  See Am. Indictment.  Count One charges Khalil, Saad, Schroeder, and Abdelsyed under 18 U.S.C. § 371 with a conspiracy to defraud the United States and to pay and receive health care kickbacks in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b.  Am. Indictment ¶¶ 30–46. Count Two charges Khalil, Saad, Schroeder, and Harris with a conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. § 1349.  Id. ¶¶ 47–65.  Counts Three and Four, which are not presently at issue, charge Schroeder with aggravated identity theft in violation of 18 U.S.C. §§ 1028A and 2.  Id. ¶¶ 66–68.[3]  Abdelsyed has pleaded guilty to Count One.  See Plea Agreement (Dkt. 101).

The amended indictment alleges the following central facts.  Abdelsyed owned Spectra Clinical Labs, Inc., a participating provider with Medicare, from at least January 2016 to April 2021.  Am. Indictment ¶¶ 18, 21.  Khalil operated Spectra as its chief executive officer and president from at least January 2016 through March 2020.  Id.  ¶ 21.  In addition, Khalil jointly owned and controlled two Michigan companies, Spectra Acquisition Corporation (SAC) and Top Tier Consultants L.L.C.  Id. ¶¶ 19, 20.  Saad and Schroeder were recruiters paid by SAC and Top Tier to obtain urine samples and physician orders for urine drug testing by Spectra, which was to be billed to Medicare.  Id. ¶¶ 22, 24.  Harris was the owner of Charlotte Pain Management Clinic (CPMC) and "provided [Schroeder] with [] access to CPMC for the purpose of allowing [him] to obtain urine samples and physician orders for urine drug testing."  Id. ¶ 26.

_____

Court held a hearing on the motions on January 24, 2024.

[3] The title of Counts 3 and 4 cites to "18 U.S.C. §§ 1028A and 2" while ¶ 68 of the amended indictment cites to "18 U.S.C. 1028A(a)(1) and (2)."

With respect to Count One, the amended indictment alleges a conspiracy in which Defendants—through SAC and Top Tier—paid recruiters Saad and Schroeder to ensure that Medicare beneficiaries' urine samples were referred to Spectra by physicians for urine drug testing, which was to be billed by Spectra to Medicare.  Id. ¶¶ 30–46.  According to the Government, these payments constituted illegal renumeration, including kickbacks and bribes, in violation of the AKS.  Id. ¶ 31.  Relevant paragraphs from the amended indictment include the following:

- From in or around January 2016, and continuing through in or around April 2021, the exact dates being unknown to the Grand Jury, in Wayne and Oakland Counties, in the Eastern District of Michigan, and elsewhere, Defendants SHERIF KHALIL, ALI SAAD, KURT SCHROEDER, and NAGI ABDELSAYED did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, as well as with Co-Conspirator 1, and others known and unknown to the Grand Jury to commit certain offenses against the United States, that is:

    a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371;

    b. to offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, in violation Title 42, United States Code, Section 1320a-7b(b)(2)(A) and (B); and

    c. to willfully solicit or receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind: (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for

3

which payment may be made in whole or in part under a Federal health care program, that is, Medicare, in violation Title 42, United States Code, Section 1320a-7b(1)(1)(A) and (B).  Id.

- It was a purpose of the conspiracy for Defendants . . . to unlawfully enrich themselves by: (1) offering, paying, soliciting, and/or receiving kickbacks and bribes to ensure that Medicare beneficiaries' urine samples were referred by physicians to Spectra for urine drug testing; (2) submitting or causing the submission of claims to Medicare for urine drug testing of urine samples referred to Spectra as a result of the payment of kickbacks and bribes; and, (3) diverting proceeds of the fraud for the personal use and benefit of the [D]efendants and their co-conspirators.  Id. ¶ 32.

- The manner and means by which the [D]efendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following: Defendants . . . devised and participated in a scheme to pay and/or receive illegal kickbacks and bribes in exchange for referring urine samples and physician orders for urine drug testing to Spectra for the purpose of billing Medicare.  Id. ¶ 33.

With respect to Count Two, the amended indictment alleges a conspiracy in which Defendants submitted false and fraudulent claims to Medicare via interstate wire for (i) claims based on kickbacks and bribes, and (ii) claims that were medically unnecessary and/or not eligible for Medicare reimbursement.  Id. ¶ 49.  Relevant paragraphs from the amended indictment include the following:

- From at least January 2016, and continuing through in or around the March 2020, the exact dates being unknown to the Grand Jury, in Wayne and Oakland Counties, in the Eastern District of Michigan, and elsewhere, Defendants Sherif Khalil, Ali Saad, Kurt Schroeder, And Nancy Harris did willfully and knowingly combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely . . . to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.  Id. ¶ 48.

4

- It was a purpose of the conspiracy for Defendants . . . and their coconspirators, to unlawfully enrich themselves by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare via interstate wire for claims based on kickbacks and bribes; (b) submitting or causing the submission of false and fraudulent claims to Medicare via interstate wire for services that were (i) medically unnecessary and/or (ii) not eligible for Medicare reimbursement; (c) concealing the submission of false and fraudulent claims via interstate wire to Medicare and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the [D]efendants and their co-conspirators.  Id. ¶ 49.

According to the amended indictment, recruiters were specifically trained to obtain physician orders for "comprehensive" urine drug testing, which has the highest Medicare reimbursement rate.  Id. ¶¶ 16, 55.  In 2018, Khalil and Saad retained a private compliance company, which informed them that orders for comprehensive urine drug testing should be rare, and that Spectra was required to collect documentation from physicians to support each comprehensive urine drug testing claim submitted to Medicare.  Id. ¶ 56.  In 2019, over 70% of claims for urine drug testing submitted by Spectra to Medicare were for comprehensive urine drug testing.  Id. ¶ 57.  Spectra did not collect supporting documentation for all claims.  Id. ¶ 58. Recruiters were paid as a percentage of Spectra's reimbursements from Medicare and other insurers.  Id. ¶ 64.

The amended indictment also alleges that Harris and Schroeder obtained a physician stamp that Schroeder used to stamp orders for comprehensive urine drug testing, without the permission of the physician.  Id. ¶¶ 60–63.  This allegation forms the basis for Counts Three and Four.

## II.    ANALYSIS

The Court addresses Defendants' motions to dismiss Count One and Count Two in turn, finding that both motions should be denied.

### A.  Motion to Dismiss Count One

Defendants argue that Count One should be dismissed for three reasons.  First, Defendants argue that Count One does not charge a conspiracy to violate the AKS.  Br. Supp. Mot. to Dismiss Count One at 8–19.  Second, Defendants contend that the AKS is unconstitutional as applied.  Id. at 19–23.  Third, Defendants argue that Count One fails to charge a conspiracy to defraud the United States.  Id. at 23–25.  The Court begins by discussing the general test for assessing the sufficiency of an indictment and then addresses each of Defendants' arguments in turn.

#### 1.  Sufficiency of an Indictment

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  The United States Supreme Court has articulated a two-part test for assessing the sufficiency of an indictment.  An indictment is sufficient if it (i) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (ii) "enables [a defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling v. United States, 418 U.S. 87, 117 (1974).

The first requirement is generally met if "an indictment set[s] forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offen[s]e intended to be punished."  Id. (punctuation modified).  But the language of the statute must also "be accompanied with such a statement of the facts and circumstances as will inform the accused

of the specific offen[s]e, coming under the general description, with which he is charged." Id. at 117–118 (punctuation modified). With respect to the second requirement, a defendant is considered able to adequately plead an acquittal or conviction in bar of any future prosecutions arising from the same offense if the indictment includes "the relevant time period and the specific event that triggered the charge." United States v. Anderson, 605 F.3d 404, 411 (6th Cir. 2010).

A defendant may move to dismiss an indictment before trial if the indictment lacks in specificity, Federal Rule of Criminal Procedure 12(b)(3)(B)(iii), or fails to state an offense, Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

### 2. Failure to Charge a Conspiracy to Violate the AKS

Defendants argue that Count One fails to charge a conspiracy to violate the AKS for two reasons. First, Defendants contend that Count One fails to allege that the Defendants paid or received improper remuneration. Br. Supp. Mot. to Dismiss Count One at 9–18. Second, Defendants argue that Count One fails to allege that they knew their conduct was unlawful. Id. at 18–19.

### i. Failure to Allege Improper Remuneration

The relevant portion of the AKS reads as follows:

(b) Illegal remunerations

    (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

        (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in

whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b).

Section 1320a-7b(b)(1)(A) prohibits knowingly and willfully <u>receiving</u> any remuneration in return for <u>referring</u> an individual to a person for the furnishing or arranging for the furnishing of any item or service reimbursed by Medicare.  Its companion provision, § 1320a-7b(b)(2)(A), prohibits knowingly and willfully <u>offering or paying</u> for any such remuneration.  The Court refers to these subsections as the "refer prongs."[4]  Similarly, § 1320a-7b(b)(1)(B) prohibits knowingly and willfully <u>receiving</u> any remuneration in return for <u>arranging for or recommending</u> purchasing, leasing, or ordering any good, facility, service, or item reimbursed by Medicare.  Its companion provision, § 1320a-7b(b)(2)(B), prohibits knowingly and willfully <u>offering or paying</u> for any such remuneration.  The Court refers to these subsections as the "recommend prongs."

---

[4] This nomenclature was used by the Seventh Circuit in <u>United States v. Polin</u>, 194 F.3d 863, 865 (7th Cir. 1999).

The amended indictment tracks the language of both the refer and recommend prongs, alleging that the conspiracy encompassed both.  See Am. Indictment ¶ 31 (alleging that Defendants conspired to "pay remuneration . . . to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made . . . under . . . Medicare; and (ii) to . . . arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made . . . under . . . Medicare").

Defendants argue that the indictment is defective because it does not allege that the payees of the remuneration were in a position to make referrals or recommendations or that they were paid to do so.  Br. Supp. Mot. to Dismiss Count One at 10.  They contend that the AKS is an anti-corruption statute, designed to prohibit remuneration by providers of products or services "to medical decision makers or those in a position to unduly influence them."  Id. at 16.  They assert that the recruiters were mere "marketers" who were compensated to obtain referrals or recommendations from physicians—and thus "do[] not profit from an undisclosed conflict of interest or breach of duty of loyalty"—thereby avoiding any "corrupt financial arrangement."  Id. at 17.

But case law makes clear that the AKS may extend to individuals who do not have the formal power to make a referral or a recommendation.  In United States v. Shoemaker, 746 F.3d 614 (5th Cir. 2014), the owner of a nursing staffing company paid the hospital board chair for every hour of care supplied by the staffing company's nurses.  Id. at 617.  Although the hospital board chair had no role in selecting the staffing company, he lobbied the hospital's chief operating officer—who did have procurement authority—to select the staffing company.  Id.  The scheme resulted in guilty verdicts under the AKS for both the staffing company owner and the chief

operating officer.  Id. at 619.  The verdicts, however, were vacated by the district court's grant of a judgment of acquittal, based on its reasoning that the hospital board chair had no decision-making authority for procurement of the nursing staff.  Id. at 626.  The Fifth Circuit reversed the district court's grant of a judgment of acquittal, concluding that the evidence supported a finding that the two defendants conspired with the intent to induce the hospital board chair to arrange for or recommend procurement of nursing services from the staffing company.  Id. at 626–631.  The court of appeals explained that, in analyzing the reach of the AKS, "[t]he focus on intent, not titles or formal authority . . . accords with Congress's concerns in enacting the statute—to broaden liability to reach operatives who leverage fluid, informal power and influence."  Id. at 629–630.

Another Fifth Circuit case confirms that the payment to an individual with something less than formal power to refer can trigger culpability under the AKS.  In United States v. Marchetti, 96 F.4th 818 (5th Cir. 2024), the Fifth Circuit affirmed the conviction of a recruiter who was paid by a medical laboratory "to attract Medicare referrals."  Marchetti, 96 F.4th at 821.  The court explained that, for the Government to produce sufficient evidence to sustain a conviction under the AKS, it "needed to prove that . . . Marchetti intended improperly to influence those who make healthcare decisions on behalf of patients."  Id. at 827 (punctuation modified).  The court described Marchetti's involvement in one particular scheme as: "[The lab] pays Marchetti, Marchetti is part of a scheme that selects service provider for patient, that selection is apparently never overruled—because it seems to have been hidden from the patients and providers."  Id. at 827.  According to the court, "in the context of the [] scheme, Marchetti might have been the relevant decisionmaker. And he was being compensated per referral. That is a substantive AKS violation."  Id.

The notion that formal authority is required to refer was also rejected in United States v. Crane, 781 F. App'x 331 (5th Cir. 2019), where the court affirmed the conviction under the AKS

of a patient recruiter for a partial-hospitalization program.  The court found it "irrelevant that Crane could not force his patients to attend [the PHP] and that he did not influence control over his patients' doctors."  Id. at 335.  Because "the evidence at trial support[ed] the jury's conclusion that the payments to Crane were intended for patient referrals, not advertising services, and that Crane understood that the payments were for patient referrals," the court upheld Crane's conviction.  Id.

The caselaw thus rejects Defendants' argument here that no crime was properly alleged in the amended indictment on the theory that the payments were allegedly made to persons who had no formal authority to make referrals or recommendations.  In the present case, the full extent of the relationship between the recruiters and CPMC and its physicians is not yet known.  Factual development will be required to learn what those relationships were and what connection, if any, they had to any referrals and recommendations.  For example, details about the specific "access" to CPMC Harris granted Saad and Schroeder may well show how they made recommendations to that company's physicians, arranged for services, and persuaded the physicians to refer business to Spectra.

On the other hand, it may turn out that further factual development will confirm the defense theory that Defendants were engaged in non-actionable activities such as advertising.  See, e.g., Crane, 781 F. App'x at 334–335 (explaining that "[w]here advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser unduly influences or act[s] on behalf of the purchaser," the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment to refer an individual to a person under § 1320a–7b(b)(2)(A)).

Precisely because a trial fleshes out factual issues—unlike an indictment that typically recites unnuanced allegations—courts do not dismiss an indictment so long as it satisfies the requirement of giving notice to defendants of the charge they face and enables them to plead it as a bar in any future prosecution.  The appropriate venue for resolving issues of fact bearing on the elements of an offense is a trial, not a motion attacking the indictment.  See United States v. Jackson, No. 16-cr-20188, 2016 WL 4205998, at *2 (E.D. Mich. Aug. 10, 2016) ("[I]f a defendant's pretrial motion requires the court to find facts that make up the elements of the case which would normally be reserved to the jury . . . the motion should be denied.") (citing United States v. Cumberland Wood & Chair Corp., 978 F.2d 1259, at *3 (6th Cir. 1992) (per curiam) (table)).

Count One is "sufficient unto the day" for purposes of satisfactorily stating a charge.

### ii.   Failure to Allege that Defendants Knew Their Conduct Was Unlawful

Defendants also argue that Count One does not charge a conspiracy to violate the AKS because it fails to allege that Defendants knew their conduct was unlawful.  Br. Supp. Mot to Dismiss Count One at 18–19.  According to Defendants, Count One alleges that Defendants "willfully" conspired to violate the AKS, but it does not allege the requisite mens rea for a violation of the AKS itself, which Defendants claim is a necessary element of conspiracy to violate the AKS. Id. at 19.  Defendants cite United States v. Nora, 988 F.3d 823, 830 (5th Cir. 2021), for the proposition that "[c]onspiracy has two intent elements—intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense."  But Nora arose in the context of a motion for a judgment of acquittal and addressed whether the defendant's convictions were supported by sufficient evidence, not the sufficiency of an indictment.  Id. at 829.

The case cited by the Government, <u>United States v. Martinez</u>, 981 F.2d 867 (6th Cir. 1992), is more applicable to the case at hand.  <u>See</u> Gov't Resp. at 6.  In <u>Martinez</u>, the Sixth Circuit held that an indictment can be sufficient even if it does not specify the required <u>mens rea</u>, so long as it cites to the appropriate statutes for the offense charged.  <u>Martinez</u>, 981 F.2d at 872 ("[A]lthough the indictment does not expressly allege willfulness, it does allege the appropriate sections of the United States Code.  We believe that citation to the statutes informed [the defendant] of the elements of the charged offenses . . . .  We also believe that this indictment gave [the defendant] adequate notice of the charges against her.  Accordingly, we hold that the indictment was constitutionally sufficient.") (punctuation modified).  The same reasoning applies here, where the indictment cites the relevant portion of the AKS, thereby informing Defendants of the elements of the charged offenses.  Further, it alleges that the Defendants "willfully . . .conspire[d] . . . ." Am. Indictment ¶ 31.  The amended indictment is not infirm on a theory that it failed to allege willfulness.

### 3.   Constitutionality of the AKS

Next, Defendants argue that the AKS is vague and does not afford fair notice that paying marketers to obtain physician orders is a crime.  Br. Supp. Mot to Dismiss Count One at 19–21.  Defendants note that the AKS does not define the terms "refer," "order," "arrange," or "recommend," and contend that the law offends due process as applied.  <u>Id.</u>

To ascertain a statute's meaning, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." <u>Gundy v. United States</u>, 588 U.S. 128, 141 (2019) (punctuation modified).  Terms that are not defined are "interpreted as taking their ordinary, contemporary, common meaning."  <u>Sandifer v. U.S. Steel Corp.</u>, 571 U.S. 220, 227

(2014) (punctuation modified).  Courts may utilize standard dictionaries to determine the ordinary meaning of words.  Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1060 (6th Cir. 2014).

Here, the words "refer," "order," "arrange," and "recommend," as used in the AKS, are not overly technical.  Their standard dictionary definitions suffice to give Defendants notice of the conduct prohibited by the AKS.  Defendants do not offer any specific argument to the contrary or point to competing interpretations of the words.  In their motion to dismiss, Defendants mention these words only as part of their now-abandoned argument that the term "remuneration" is not sufficiently defined.[5]  See Br. Supp. Mot. to Dismiss Count One at 19–21.  "It is not the court's responsibility to craft winning legal arguments for" the parties.  United States v. Mungarro, No. 07-20076, 2020 WL 1933816, at *3 (E.D. Mich. Apr. 22, 2020).

In addition, the Supreme Court has recognized "that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  Village of Hoffman Estates, Inc. v. The Flipside, 455 U.S. 489, 499 (1982).  As discussed previously, to violate the AKS a person must act "knowingly and willfully."  § 1320a-7b(b)(1) and (2).  As another district court has explained, "[t]his strong scienter requirement overcomes any potential vagueness in the statute because a person who would otherwise be ensnared without notice does not violate the statute.  Myriad courts have previously considered vagueness challenges to the Anti–Kickback Statute and rejected them, largely on the basis that the requirement of willfulness—knowledge that the act is unlawful—mitigates any vagueness concerns."  United States v. Williams, 218 F. Supp. 3d 730, 740 (N.D. Ill. 2016) (collecting cases).

---

[5] Although Defendants' motion seems to argue that the term "remuneration" is not sufficiently defined, Br. Supp. Mot. to Dismiss Count One at 19–21, Defendants concede in their reply that the term is not unconstitutionally vague, Reply in Supp. of Mot. to Dismiss Count One at 5.

Defendants also argue that "penalizing a laboratory's payments to marketers for obtaining patient drug testing orders and urine samples from physicians is an overbroad regulation of commercial speech in violation of the First Amendment."  Br. Supp. Mot. to Dismiss Count One at 21.   Reasoning that the AKS distinguishes among speakers, Defendants contend that the restriction is subjected to heightened scrutiny.  Id. at 22.  The Government does not directly address what level of scrutiny should apply, instead arguing that its case "is about restrictions on conduct" rather than on "expression or speech."  Gov't Resp. at 17.

Defendants rely heavily on Sorrell v. IMS Health Inc., 564 U.S. 552, 562 (2011), where the Supreme Court struck down a Vermont law restricting the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors.  Defendants in Sorrell argued that heightened judicial scrutiny was unwarranted because the "sale[], transfer, and use of prescriber-identifying information are conduct, not speech."  Id. at 570.  The Supreme Court rejected this argument, holding that "the creation and dissemination of information are speech within the meaning of the First Amendment."  Id.

Sorrel is distinguishable from the present case because the AKS "is about restrictions on conduct—payments to an independent contractor to induce referrals."  United States v. Blair, 2021 WL 4339132, at *26 (D. Md. Sept. 23, 2021) (denying motion to dismiss indictment on theory that prosecution of a marketer of pharmacy services violates the First Amendment).  Charges under the AKS "target speech only insofar as the speech constitutes an offer to pay kickbacks in return for referrals."  Id.  Unlike Sorrell, which dealt with the creation and dissemination of information, the AKS "targets the conduct of providing remuneration to independent contractors with the intent to induce referrals, not the statements related to those payments."  Id.  at *27.  Simply because speech may be utilized in the course of criminal conduct does not insulate it from prosecution by virtue

of the First Amendment.  <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 502 (1949) ("[I]t

has never been deemed an abridgement of freedom of speech or press to make a course of conduct

illegal merely because the conduct was in part initiated, evidenced, or carried out by means of

language, either spoken, written or printed.").

Thus, even if Defendants' alleged conduct did constitute speech, such speech was not

protected under the First Amendment.[6]  <u>Blair</u>, 2021 WL 4339132 at *26.

### 4.  Conspiracy to Defraud the United States

Defendants next contend that the Government's conspiracy to defraud charge must be

dismissed because Count One, which invokes 28 U.S.C. § 371, does not allege a conspiracy to

defraud the United States independent of the conspiracy to violate the AKS.  Br. Supp. Mot. to

Dismiss Count One at 23–24.  Section 371 reads: "If two or more persons conspire either to commit

any offense against the United States, or to defraud the United States, . . . each shall be fined under

this title or imprisoned not more than five years, or both."  Defendant's argument stems from the

fact that Count One charges Defendants with participating in a dual-object conspiracy under both

clauses of § 371: (i) to commit an offense against the United States and (ii) to defraud the United

States.  Am. Indictment ¶ 31.

Defendants rely on <u>United States v. Minarik</u> for the proposition that § 371 is read to

"create[] one crime that may be committed in one of two alternative ways."  <u>Minarik</u>, 875 F.2d

1186, 1193 (6th Cir. 1989) (emphasis omitted).  But <u>Minarick</u> is not directly applicable to the

amended indictment here.  In <u>Minarick</u>, the Sixth Circuit addressed whether the <u>same conduct</u>

could be prosecuted under both clauses of § 371.  The court explained that the primary purpose of

§ 371 "was to reach conduct not covered elsewhere in the criminal code, a code which, unlike the

---

[6] For a discussion of other post-<u>Sorrell</u> cases that have rejected First Amendment challenges to the AKS, <u>see</u> <u>Blair</u>, 2021 WL 4339132 at *27–*28.

present criminal code, had not elaborated specific fraud offenses." Id. at 1194. "In light of later legislation creating numerous specific fraud statutes, the 'defraud' portion of the statute should be viewed as an interim measure protecting the government until such time as Congress has been able to deal more specifically with a given problem." Id. (punctuation modified). This means that if conduct is prohibited by a specific criminal statute, that statute takes the conduct "out of the defraud clause and places it in the offense clause." Id. at 1196.

But here, the Government contends that its indictment reaches two different types of conduct and sets forth two distinct offenses in violation of § 371. Gov't Resp. at 15. As explained in the Government's response, "[t]he submission of claims to Medicare based on kickbacks (to defraud the United States) are separate acts from the payment of kickbacks to recruiters for referrals (an offense against the United States)." Id. (emphasis in original). Because the Government is not attempting to charge the same conduct under both clauses, Minarick is not fatal to the Government's conspiracy to defraud charge.

Defendants also argue that Count One fails to specify any deceitful and dishonest means by which they conspired to defraud the United States. Br. Supp. Mot. to Dismiss Count One at 24–25. But as the Government notes, "the submission of claims to Medicare that were procured through the payment of kickbacks to recruiters, in violation of promises made to Medicare, is inherently deceitful and dishonest and was sufficiently pled in the Amended Indictment." Gov't Resp. at 15 (citing Am. Indictment ¶¶ 10, 65–67, 33–37, 40). Further, the amended indictment alleges that Defendants failed to submit supporting documentation, despite knowing that this was required. Am. Indictment ¶ 56–58.

For the reasons detailed above, all of Defendants arguments with respect to Count One fail. The Court, therefore, denies the motion to dismiss Count One.

### B.  Motion to Dismiss Count Two

Count Two charges Khalil, Saad, Schroeder, and Harris with a conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. § 1349.  Am. Indictment ¶¶ 47–65.  Defendants argue that Count Two should be dismissed for two reasons.  First, Defendants argue that the indictment does not specify any false and fraudulent pretense, representation, or promise.  Br. Supp. Mot. to Dismiss Count Two at 3.  Second, Defendants argue that Count Two fails to charge that the Defendants conspired to defraud Medicare of money or property.  Id.  The Court addresses each argument in turn, finding that the amended indictment is sufficient in both regards.

### 1.   False and Fraudulent Pretense, Representation, or Promise

The amended indictment alleges that the Defendants conspired to commit health care fraud and wire fraud by means of materially false and fraudulent pretenses, representations, and promises.  Am. Indictment ¶ 48.  The allegations track the language of 18 U.S.C. § 1349 (attempt and conspiracy), § 1343 (wire fraud), and § 1347 (health care fraud).  Id.  Specifically, the amended indictment alleges that Defendants submitted false and fraudulent claims to Medicare via interstate wire for claims (i) based on kickbacks or bribes and (ii) for medically unnecessary services and/or services that were not eligible for Medicare reimbursement.  Id. ¶ 49.

Defendants argue that Count Two must be dismissed because "it fails to specify any false or fraudulent pretense, representation, or promise."  Br. Supp. Mot. to Dismiss Count Two at 10.  According to Defendants, "[t]his lack of specificity is fatal to the charge."  Id.  Defendants cite Evans v. United States, 153 U.S. 584, 594 (1894), in which the Supreme Court held that "an allegation of fraud is insufficient . . . in an indictment . . . without giving the particulars of the

fraud." But Defendants fail to recognize that the amended indictment alleges multiple fraudulent pretenses, representations, or promises.

The amended indictment alleges that, in or around June 2018, Khalil and Saad retained a private compliance company which informed them "that performing definitive urine testing, particularly for testing urine samples for 22 or more classes of drugs, and the use of Code G0483 to bill claims to Medicare should be rare and that Spectra was required to collect supporting documentation from physicians to support each claim submitted to Medicare under Code G0483." Am. Indictment ¶ 56. The amended indictment also alleges that "[b]y becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims." Id. ¶ 9. "Medicare further required providers to certify that they understood that a payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute." Id. ¶ 10.

Yet the year after retaining the private compliance company, the amended indictment alleges that Spectra did not collect supporting documentation for all comprehensive claims, despite knowing that it was required to do so. Id. ¶ 58. As an enrolled provider in Medicare, Spectra certified that its claims would comply with laws, regulations, and program instructions. Continuing to submit claims that Spectra knew did not comply with documentation requirements, and therefore were not eligible for Medicare reimbursement, constituted a fraudulent pretense, representation, or promise.

The Government also contends that Defendants submitted fraudulent claims for medically unnecessary testing. To support this claim, the amended indictment alleges that over 70% of

Spectra's claims for urine drug testing were comprehensive the year after a private compliance company informed Spectra that such testing should be rare.  Id. ¶ 57.  This allegation implies that Defendants must have known that at least some of the claims for comprehensive urine drug testing were medically unnecessary.  This is not to say that the 70% figure alone will be enough to convince a jury at trial.  But as the Government itself has acknowledged, "[w]hether the government can meet its burden at trial to prove such pretenses, representations, and/or promises, or the Defendants' knowledge of the same, is not matter properly entertained through a motion to dismiss."  Gov't Resp. at 21.

For these reasons, Defendants' argument that Count Two must be dismissed because it does not specify any false or fraudulent pretense, representation, or promise fails.

### 2.   Money or Property Interest

Defendants also contend that Count Two fails to charge that the Defendants conspired to defraud Medicare of money or property, which is traditionally a required element of fraud.  Br. Supp. Mot. to Dismiss Count Two at 16 (citing McNally v. United States, 483 U.S. 350, 356–357 (1987)).  According to Defendants, "Count Two's allegation that the defendants conspired to defraud Medicare of money by submitting claims based on kickbacks and bribes and/or for services that were not eligible for reimbursement impermissibly extends the wire and health care fraud statutes to schemes to defraud government agencies of their regulatory authority . . . ."  Br. Supp. Mot to Dismiss Count Two at 17.  Put another way, Defendants argue that even if a claim was based on kickbacks or lacked proper documentation, there was no financial injury to Medicare so long as the claim was medically necessary and provided to a qualified beneficiary.  According

to Defendants, these claims merely deprived Medicare of its regulatory authority, which does not amount to fraud.

Defendants cite two cases in support of their argument, neither of which is applicable to the case at hand.  In <u>Cleveland v. United States</u>, 531 U.S. 12 (2000), the defendants were convicted of mail fraud for false statements made in an application for a state video poker license.  <u>Cleveland</u>, 531 U.S. at 15.  The Supreme Court held that the federal mail fraud statute, 18 U.S.C. § 1341, "does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands."  <u>Cleveland</u>, 531 U.S. at 20.  This holding was based, in large part, on a finding that the state's "core concern" related to video poker licenses is regulatory.  <u>Id.</u>

In Defendants' other citation, <u>Kelly v. United States</u>, 590 U.S. 391 (2020), the defendants were public officials charged with wire fraud and federal-program fraud.  <u>Kelly</u>, 590 U.S. at 393. The defendants allegedly reduced the number of toll lanes leading to the George Washington Bridge, which is administered by the Port Authority of New York and New Jersey, with the goal of increasing traffic and punishing the mayor of Fort Lee, New Jersey, for refusing to support the New Jersey Governor's reelection bid.  <u>Id.</u>  The Supreme Court had to decide whether the defendants intended to obtain the Port Authority's money or property, which was a required element of the federal fraud statutes with which they were charged.  <u>Id.</u>  The Government argued that the defendants' goal was financial "because the officials sought both to 'commandeer' the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort."  <u>Id.</u>  The Supreme Court disagreed, finding that "the realignment of the toll lanes was an

exercise of regulatory power" and "the employees' labor was just the incidental cost of that regulation." Id. at 393–394.

Both cases are distinguishable from the case at hand.  Unlike Cleveland—which dealt with video poker licenses—and Kelly—which dealt with toll lanes—the instant case relates directly to money paid by the Government for Medicare claims.  The financial goal of Defendants' alleged fraud here was not merely "incidental," but rather the sole object of Defendants' alleged scheme. To the extent the Government's regulatory power was also impeded, that was incidental to the financial cost to the Government of Defendants' alleged financial scheme.  Defendants' attempt to stretch the existing case law regarding regulatory power to the case at hand fails.

### III.    CONCLUSION

For the foregoing reasons, the Court (i) denies Defendants' motions to dismiss Count One (Dkt. 78) and Count Two (Dkt. 79) and (ii) grants Harris's motion to adopt Khalil's motion to dismiss Count Two and motion for bill of particulars (Dkt. 81).

SO ORDERED.

Dated:  June 25, 2024                              s/Mark A. Goldsmith
Detroit, Michigan                                    MARK A. GOLDSMITH
                                                     United States District Judge