UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                           Case No. 22-cr-20200

v.

                                             HON. MARK A. GOLDSMITH

D-1 SHERIF KHALIL,

               Defendant.

_____/

## ORDER GRANTING DEFENDANT SHERIF KHALIL'S MOTION FOR JUDGMENT OF ACQUITTAL AND CONDITIONALLY DENYING ALTERNATIVE MOTION FOR NEW TRIAL (Dkt. 343)

This matter is before the Court on Defendant Sherif Khalil's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and alternative motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 (Dkt. 343).[1]  For the reasons set forth below, the Court grants the motion for judgment of acquittal in full and conditionally denies the alternative motion for new trial.

_____

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. L.R. 7.1(f)(2).

Khalil's original motion (Dkt. 332) was fully briefed (see Dkts. 334, 335, 336), but the Court allowed all parties to submit revised briefs that supplied additional citations to the record.  4/30/25 Order (Dkt. 340).  Khalil filed a revised motion (Dkt. 343) and reply (Dkt. 342).  The Government filed a revised response (Dkt. 341) and sur-reply (Dkt. 342).  The Court denies Khalil's original motion (Dkt. 332) as moot.

# I.    BACKGROUND

In April 2022, a grand jury indicted Khalil and four others with separate but related healthcare fraud offenses.  See Am. Indictment (Dkt. 18).[2]  Khalil was charged with two counts: (i) conspiracy to defraud the United States and violate the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b (Count One) and (ii) conspiracy to commit health care fraud and wire fraud (Count Two).  Am. Indictment ¶¶ 30–65.  Three Defendants pled guilty, leaving two for trial: Khalil and Nancy Harris.  See Plea Agreements (Dkts. 101, 269, 270).  At the conclusion of the six-week trial, the jury found Khalil guilty on both counts against him and Harris not guilty of the single count of wire fraud conspiracy against her.  Jury Verdict Form (Dkt. 327).  Khalil has now filed a motion for judgment of acquittal and alternatively a motion for new trial.  For the reasons set forth below, the Court grants the motion for judgment of acquittal as to both counts and conditionally denies the motion for a new trial.

# II.    ANALYSIS

## A.  Motion for Judgment of Acquittal

Khalil asks the Court to acquit him of both counts pursuant to Federal Rule of Criminal Procedure 29.  Mot. at 3.  Rule 29 enables a court to enter an acquittal where the evidence is insufficient to support a jury's guilty verdict.  Fed. R. Crim. Pro. 29(c)(2), (a).  "Claims of insufficient evidence are determined by inquiring whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier could have found the essential elements of the

---

[2] The amended indictment charged Defendants Khalil, Ali Saad, Kurt Schroeder, Nagi Abdelsyed, and Nancy Harris on four counts of healthcare related offenses.  Am. Indictment (Dkt. 18).  Count One charged Khalil, Saad, Schroeder, and Abdelsyed with a conspiracy to defraud the United States and to pay and receive health care kickbacks.  Id.  ¶¶ 30–46. Count Two charged Khalil, Saad, Schroeder, and Harris with a conspiracy to commit health care fraud and wire fraud.  Id.  ¶¶ 47–65. Counts Three and Four charged Schroeder with aggravated identity theft.  Id.  ¶¶ 66–68.

crime beyond a reasonable doubt." United States v. Coleman, 458 F.3d 453, 456 (6th Cir. 2006) (punctuation modified).  "In examining claims of insufficient evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute its judgment for that of the jury." United States v. Driver, 535 F.3d 424, 429 (6th Cir. 2008) (punctuation modified). Defendants asserting insufficiency of the evidence arguments have a heavy burden, and circumstantial evidence alone can sustain a conviction.  United States v. Wettstain, 618 F.3d 577, 583 (6th Cir. 2010).

### 1. Count One

Count One charged Khalil and others under 18 U.S.C. § 371 with a conspiracy to defraud the United States and to offer, pay, solicit, and receive health care kickbacks in violation of the AKS.  The alleged kickbacks consisted of payments from an entity controlled by Khalil to marketers, who obtained orders for urine drug testing (UDT) from clinics, which were processed at a laboratory owned by Khalil.[3]

To find Khalil guilty of the AKS charge, the Government had to prove that: (i) Khalil and at least one other person conspired, or agreed, to commit the crime of offering, soliciting, and receiving health care kickbacks; (ii) Khalil willfully, knowingly, and voluntarily joined the conspiracy; and (iii) a member of the conspiracy did one overt act for the purpose of advancing or helping the conspiracy.  Jury Instruction 17 (Dkt. 357).  The word "willfully" means that Khalil

---

[3] The alleged participants in this enterprise include the following. Schroeder and Saad were marketers. Spectra Clinical Labs, Inc. (Spectra) was a lab based in California that performed the urine and drug screening testing.  Tr. Vol. 4 at 66 (Dkt. 292).  Spectra was initially owned by Abdelsyed. Id. at 76.  In 2014, Khalil and another man, Youssef Bakri, purchased Spectra from Abdelsyed.  Tr. Vol. 4 at 76–78.  Harris owned Charlotte Pain Management Center (CPMC), a physician practice located in Florida. Id. at 62. Schroeder and Saad solicited CPMC, which sent orders for urine drug screening tests to Spectra. Id. at 67.  Spectra billed these orders to Medicare. Id. at 62.

must have known that payments to marketers were unlawful, although he need not have known the precise statute that renders the conduct unlawful.  Id.

Khalil makes two arguments regarding Count One.  First, Khalil argues that the evidence was insufficient to show that the payments were unlawful.  Mot. at 5 n.1.  Second, he argues that the evidence was insufficient to prove that he acted willfully.  Mot. at 4–8.  The Court addresses each argument in turn, agreeing with Khalil on both points.[4]

### a.  Conduct Prohibited by the AKS

The relevant portion of the AKS reads as follows:

> (1) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b).[5]

---

[4] Although Count One and Count Two were both conspiracy charges, the parties often frame their arguments in terms of completed substantive offenses.  See, e.g., Mot. at 4 (arguing that no rational juror could find that Khalil knew Spectra's payments to marketers were unlawful).  Strictly speaking, the issue is what the conspirators contemplated in their agreement—not what substantive offenses were completed.  See United States v. Jimenez Recio, 537 U.S. 270, 274–75 (2003) (explaining that a conspiracy is an agreement to commit a crime, which is "a distinct evil, which may exist and be punished whether or not the substantive crime ensues") (internal quotations omitted).  Because the parties' framing does not affect the Court's analysis, the Court utilizes their framing throughout this opinion.

[5] The term "arranging for" appears in both subsections (A) and (B).  But under subsection (A), the person who is paid the kickback refers an individual for the furnishing or arranging of a service.

4

The amended indictment tracked the language of subsections (A) and (B), alleging that Defendants conspired to "pay remuneration . . . to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made . . . under . . . Medicare; and (ii) to . . . arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made . . . under . . . Medicare"). Am. Indictment ¶ 31 . But as the case progressed, it became clear that the Government's theory focused on referrals under subsection (A) only.

Ultimately, the Government asked for an instruction based on the referral language in the statute. The final AKS instruction given to the jury stated that the elements of a kickback include that a person must receive the renumeration in order "to induce or in return for the referring of an individual to a person for the furnishing or arranging for the furnishing of an item or service that could be paid for, in whole or in part, by a Federal health care program." Jury Instruction 18(1)(B). This language tracks the language of subsection (A) and was identical, in relevant part, to the Government's proposed instruction. See Gov. Proposed Jury Instructions at 4 (Dkt. 201-1).

The Government did not request an instruction that mentions "arranging for or recommending" a service without regard to "referring." Had it done so, that  would have mirrored subsection (B). The jury was only instructed on referrals, and thus was tasked with determining whether there was sufficient evidence to convict under subsection (A). The Government's closing argument confirmed that it was proceeding under subsection (A) only, because it quoted the

---

Under subsection (B), the person paying the kickback does not do so to  induce a referral from the payee; the payor does so to induce the payee to arrange for or recommend the service.

A separate subsection of the AKS, similarly worded, prohibits knowingly and willfully receiving any such remuneration. See 42 U.S.C. § 1320a-7b(b)(1)(A)–(B).

language from the instruction about referrals and stated: "[t]hat just means that Khalil paid money to other individuals in exchange for referrals of comprehensive urine drug test [sic] which he then billed to Medicare." Tr. Vol. 23-A at 65 (Dkt. 325).[6] For this reason, the remainder of the Court's discussion of the AKS refers only to subsection (A) and its requirement for a referral.

The classic example of conduct prohibited by the AKS is paying a doctor or other healthcare provider in exchange for sending patients to a particular healthcare provider. See United States v. Sorensen, 134 F.4th 493, 499 (7th Cir. 2025) (collecting cases). Unlike in the classic example involving payments to doctors or other service providers, this case involves payments to marketers. Whether the AKS prohibits such payments has been the subject of much debate between the parties at various points in the case.

Before trial, Khalil filed a motion to dismiss Count One, arguing that the AKS only prohibits payments to individuals with the formal power to make a referral. United States v. Khalil, No. 22-cr-20200, 2024 WL 3160312, at *5 (E.D. Mich. June 25, 2024). The Court rejected this argument, holding that the AKS may extend to non-providers who do not have the formal power to make a referral, including a situation where the non-provider exerts some form of undue influence over the person who will then formally make the referral.[7] Id. at *5–6.

_____

[6] At the conference over jury instructions before closing arguments, the Government made conflicting statements regarding the two subsections. At one point, it stated that the Indictment referenced both subsections, but the evidence adduced at trial only pertained to subsection (A). When asked by the Court "are you also under 2B or just 2A," Government counsel responded, "So the allegation was both, but the evidence here would be just under 2A." Tr. Vol. 22-B at 192–193. Yet shortly thereafter, Government counsel explained that the Government was proceeding under both 2A and 2B. Id. at 193. However, counsel then stated, "[T]he conspiracy is that there was a referral…." Id. at 195-196. Because subsection (B) makes no reference to referrals, the only fair construction of the Government's position was that it was proceeding only under subsection (A), which is consistent with how it argued to the jury in closing arguments.

[7] During trial, Khalil conceded that the AKS can extend to non-physicians. During discussion of the proposed jury instructions, counsel for Khalil stated that he "agree[s] with the Court that the [AKS] has not been limited strictly to physicians." Tr. V. 22-B at 144. But as he correctly noted,

6

This holding was in line with courts from other circuits, which have held that the AKS can extend to non-providers in certain circumstances.  See, e.g., United States v. Shoemaker, 746 F.3d 614 (5th Cir. 2014) (holding that payments from the owner of a nurse-staffing company to a hospital board chair violated the AKS, where the hospital board chair had no direct role in choosing the staffing company, but lobbied the hospital's chief operating officer, who had formal decision-making power to choose the staffing company); United States v. Marchetti, 96 F.4th 818, 827 (5th Cir. 2024) (affirming an AKS conviction of a marketer paid by a medical laboratory who "intended to improperly influence those who make healthcare decisions on behalf of patients").

The Court denied Khalil's motion to dismiss but declined to decide whether the specific conduct alleged amounted to a violation of the AKS.  Khalil, 2024 WL 3160312, at *6.  At the motion to dismiss stage, the Court was only tasked with deciding whether the indictment (i) contained the elements of the offense charged and fairly informed the defendants of the charge against which they must defend, and (ii) enabled the defendants to plead an acquittal or conviction in bar of future prosecutions for the same offense.  Id. at *4 (citing Hamling v. United States, 418 U.S. 87, 117 (1974)).  The Court found that the indictment was sufficient in those respects. Id. at *6.  But as the Court explained, factual development at trial was necessary to learn the full extent of the relationship between the marketers and those who ordered UDT, and whether any degree of undue influence was present.  Id. at *6.  The Court warned that it "may turn out that further factual development will confirm the defense theory that Defendants were engaged in non-actionable activities such as advertising."  Id.

---

just because "payment to a physician isn't required, [it] doesn't follow that a payment to any other person [is a violation]."  Id. at 144–145.

A few months later, the Court clarified its holding in an opinion denying Khalil's second motion for a bill of particulars. See United States v. Khalil, No. 22-cr-20200, 2024 WL 4713823 (E.D. Mich. Nov. 7, 2024). Khalil asked the Court to order the Government to file a bill of particulars specifying all manner by which the marketers sought to improperly influence physicians. Id. at *2. Khalil apparently misunderstood the Court's ruling on the motion to dismiss as holding that undue influence is a necessary condition to prove a violation of the AKS. Id. The Court clarified that this interpretation of its holding was incorrect and explained that "undue influence [is] one factor that can be considered when determining whether something less than formal authority can trigger the AKS." Id. The Court did not preclude the possibility that other factors could possibly lead to a conviction, although the Government had not offered a clear alternative theory at that point. Id.

By the close of trial, it was clear that the Government was not arguing that marketers had exerted undue influence on CPMC's physicians.[8] Instead, the Government contended that payments to marketers to "obtain" or "secure" referrals from physicians, without more, constituted an illegal kickback. Tr. Vol. 22-B at 192–196 (Dkt. 324). The Government did not ask for an instruction on undue influence and did not argue undue influence to the jury. The Government proceeded solely on the theory that paying marketers to secure referrals from third parties was actionable.[9]

---

[8] When discussing jury instructions the evening before closing arguments, counsel for Khalil noted that the Government was not proceeding under any theory of "undue influence." Tr. Vol. 22-B at 145 ("I assumed that was going to be the [G]overnment's theory here to suggest that the evidence involving Schroeder was kind of undue influence, but they don't even want to go there. They just want a per se rule that a payment to a marketer who arranges for a referral from a physician of a patient urine sample is a violation.") The Government did not dispute this point. Id. at 144–145.

[9] At the conclusion of the conference on jury instructions, the Court decided that "both sides will be free to make their arguments about what does or doesn't satisfy the elements of the statute." Tr.

The fundamental problem with the Government's theory is that it is at variance with the plain language of subsection (A). That subsection makes it criminal for a person "to pay remuneration . . . to any person <u>to induce such person</u>: (i) <u>to refer an individual</u>…." 42 U.S.C. § 1320a-7b(2)(A) (emphasis added). That is, the person receiving the kickback must be the same person who makes the referral. <u>Id.</u> To adopt the Government's view would mean that the phrase "to induce such person to refer" would have to be ignored. The Government's view would make sense if the language had read "to induce any person" – but that is not the case.

Courts are not free to ignore the language chosen by Congress. <u>See</u> <u>Am. Tobacco Co. v. Patterson</u>, 456 U.S. 63, 68 (1982) ("[I]n all cases involving statutory construction, our starting point must be the language employed by Congress.") (punctuation modified); <u>see also</u> <u>Lamie v. U.S. Tr.</u>, 540 U.S. 526, 542 (2004) (explaining that it is "beyond [the Court's] province" to bypass what Congress has enacted and, instead, "provide for what we might think ... is the preferred result"). In interpreting a statute, courts "customarily consider the meaning an ordinary reader would give the statute's text." <u>See</u> <u>United States v. Grant</u>, 979 F.3d 1141, 1144 (6th Cir. 2020). As the Supreme Court has explained, courts cannot interpret criminal statutes in a manner that would expand their scope without offending the principles of due process, separation of powers, and the rule of lenity, which "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." <u>United States v. Davis</u>, 588 U.S. 445, 463–464 (2019).

---

Vo. 22-B at 205. While stating the Government's theory was "arguable," the Court did not state that it was correct. Concluding that the proposed AKS instruction was broad enough to cover the Government's theory, the Court allowed the case to proceed to the jury for its decision and, ultimately, any post-verdict determination of the appropriate meaning of the statute.

To be sure, courts have shown some flexibility in interpreting the language of the AKS, to ensure that the statute is not circumvented through a payment to a non-physician that produces a referral where the "payee leverage[s] fluid, informal power and influence over healthcare decisions." United States v. Sorensen, 134 F.4th 493, 599 (7th Cir. 2025) (punctuation modified). Several cases have endorsed that reading of the statute, to bring within its reach kickbacks that produce referrals through the use of undue influence or other improper conduct over third parties. See, e.g., United States v. George, 900 F.3d 405, 411 (7th Cir. 2018); United States v. Polin 194 F.3d 863, 865 (7th Cir. 1999).

This interpretation of the statute is illustrated in Sorensen, where the Seventh Circuit reversed the district court's denial of a motion for acquittal following a conviction for conspiracy to violate the AKS and substantive violations, as well.   Id. at 496.  Sorensen, as  owner of a company that distributed durable medical equipment, paid advertising and marketing companies "to advertise orthopedic braces to patients, to obtain signed prescriptions from the patients' doctors, to distribute the braces, and then to collect reimbursement."  Id.  The appellate court held that Sorensen's payments "were not made for 'referring' patients within the meaning of the [AKS]" because the payees were "neither physicians in a position to refer their patients nor other decisionmakers in positions to leverage fluid, informal power and influence over healthcare decisions."  Id. (punctuation modified).

The Government argues that Sorensen is distinguishable from the present case because Sorensen dealt with "aggressive advertising services" as opposed to "individuals who take advantage of their existing relationships with patients or other health care providers."  Sur-reply at 3 (quoting Sorensen, 134 F.4th at 501).  But as already discussed, the Government's theory in this case is not that the marketers exerted undue influence over the physicians.  Instead, the

Government is arguing that the phrase "to refer" in subsection (A) covers "obtaining" or "securing" referrals from another person. <u>Sorensen</u> clearly refutes such an interpretation, holding that the payee must be the individual who actually makes the referral, or someone with informal power to unduly influence healthcare decisions.

<u>Sorensen</u>'s approach was endorsed recently by the Fifth Circuit in <u>United States v. Cockerell</u>, 140 F.4th 213 (5th Cir. 2025). There, the court affirmed an AKS conviction of a marketer who was paid commissions based on medicinal cream prescriptions that he secured from physicians, which were billed to a federal insurance program. Although the defendant was a marketer who did not make healthcare decisions, he was culpable because he intended to induce referrals from physicians who prescribed the cream by "intend[ing] improperly to influence those who make healthcare decisions on behalf of patients." <u>Id.</u> at *2. He "showered physicians with lavish vacations and expensive dinners to encourage them to continue writing prescriptions…" – which "incentives were crucial," because if the doctors were not paid, the defendant's company "would have no business." <u>Id.</u> at *3. In harmony with <u>Sorenson</u>—which reversed an AKS conviction where "there simply [was] no evidence that [the payees] …leveraged any sort of informal power and influence over healthcare decisions," <u>Sorensen</u>, 134 F.4th at 496–497— <u>Cockerell</u> affirmed an AKS conviction where the defendant's furnishing of "lavish vacations and offerings of investment in management service organizations are evidence of …impermissible influence…." <u>Cockerell</u>, 2025 WL 1584422 at *4. <u>Cockerell</u> squarely held that payment to a marketer, without more, is not sufficient to establish improper referrals under the AKS. <u>Id.</u> at *4. The Government has cited no cases to contradict <u>Sorensen</u> or <u>Cockerell</u>'s endorsement of it.[10]

---

[10] In an earlier phase of the case, the Government had cited earlier Fifth Circuit cases, including <u>United States v Gibson</u>, 875 F.3d 179 (5th Cir. 2017), which had held that the AKS has no "relevant decision maker" or "medical judgment" requirement. Gov. Obj. to Def. Jury Instructions at 3.

Here, the Government eschewed any theory that the marketers had improper influence over physicians. Thus its theory that payments to the marketers, without such influence, satisfied the requirements of the AKS is legally unfounded. For these reasons, the Government has not shown that the conspiracy contemplated amounted to a violation of the AKS, and no rational jury could vote to convict based on the proofs and arguments presented at trial.[11]

### b. Willfulness

The Government also failed to show that Khalil acted with the requisite mens rea. To establish a violation of the AKS, the Government had to prove that Khalil knowingly and willfully offered, paid, solicited or received remunerations, including kickbacks and bribes, to or from another individual. Jury Instruction 18(1)(A). "Willfully" means that "the act was done voluntarily and purposefully, with the intent to violate a known legal duty, that is, with the intent

---

While that may mean that undue influence is not a required element of an AKS offense, it does not mean that payments to marketers to "obtain" or "secure" referrals from physicians, without more, constitute an illegal kickback. To the extent there was any doubt about that in the Fifth Circuit's view, Cockerell has clarified that point. To the extent the Government claims other Fifth Circuit cases support its view that payments to non-providers for referrals from third parties may sustain an AKS conviction without a showing of impermissible influence, Cockerell forecloses that argument, as well.

[11] In addition to conspiracy to violate the AKS, Count One charged Khalil with conspiracy to defraud the United States. The Government argued that "[t]he kickback arrangement itself defrauded the United States because every claim that was tainted by a kickback was a claim that shouldn't have been paid by Medicare." Tr. Vol. 23-A at 65. The Government thus equates the alleged kickback arrangement with fraud. Because the Court has found that the kickback arrangement contemplated by the alleged conspiracy did not violate the AKS, the Government's argument on "defrauding the Government" based on that kickback arrangement also fails.

to do something the law forbids." Jury Instruction 18(2)(B). The Government failed to show willfulness for two reasons.

First, as already discussed, the object of the conspiracy alleged by the Government did not actually amount to a violation of the AKS. Khalil cannot be deemed to have acted willfully, because the act he allegedly contemplated completing was not unlawful.

Second, even if the object of the conspiracy did amount to a violation of the AKS, no rational juror could have found beyond a reasonable doubt that Khalil knew that his payments to marketers were unlawful. The Government identifies various pieces of evidence purporting to establish Khalil's culpability, Resp. at 4–11, but the Court finds the evidence insufficient.

The Government points to Nasren Abdelsyed, who testified that she heard her husband Nagi Abdelsyed—the founder and former owner of Spectra—tell Khalil "once or twice a month" not to make any kickback payments. Resp. at 6 (citing Tr. Vol. 6-B at 16). But this statement says nothing about Nasren's understanding of what a kickback is, so it does nothing to show that Khalil was on notice of the Government's theory of culpability in this case. Moreover, the Government contends that Nasren "testified that she communicated to [Khalil] all information she received from Medicare audits regarding any problems or deficiencies." Id. at 6 (citing Tr. Vol. 6-B at 21–23). But the Government does not point to evidence that the audits had anything to do with improper remuneration. To the contrary, the audits addressed the failure to submit appropriate documentation. Tr. Vol. 7-B at 10–12; Gov. Ex. 925.

The Government also relies on testimony related to advice that attorney Keith Soltis gave to Khalil and Youssef Bakri (who co-owned Spectra with Khalil), regarding how to structure

payments to marketers.  Resp. at 6–8, 10.[12]  Bakri testified that he and Khalil decided to retain Soltis after they learned that Bank of America froze a Spectra bank account, which indicated to them that law enforcement might be investigating Spectra.  Tr. Vol. 4 at 99, 148.  Khalil spoke with a Bank of America representative, who told him that the freezing "was something from Michigan," not California, where the lab was located.  Id.  This made Bakri suspect that "something" might be "going on."  Id.  Khalil suggested that they hire a lawyer "to find out how [they can] do it right if [they were] supposedly doing something wrong."  Id.  This led to Bakri and Khalil retaining Soltis.  Id. at 150–151.

Khalil and Bakri did not meet with Soltis themselves; instead, Saad met with Soltis roughly four times.  Id. at 150.  Soltis also provided Saad with legal advice contained in a letter.  See Gov. Ex. 302.  The letter warned that Spectra's pay structure for marketers—consisting of a W-2 salary and 1099 bonus—was "contradictory and ambiguous and raise[d] regulatory compliance concerns."  Id. at 1.  Soltis advised that "[i]n order to obtain maximum protection from risk of noncompliance with applicable laws and regulations, [he] recommend[s] arrangements that satisfy a safe harbor to the [AKS]."  Id.  Bakri testified that he informed Khalil of Soltis's advice contained in the letter to Saad, which Bakri said also included creating an independent marketing company not owned by any members of Spectra.  Tr. Vol. 4 at 151–152.

After receiving Soltis's advice, Khalil and Bakri established Top Tier Consultant, a marketing company that Bakri described as independent from Spectra "on papers" but not in reality.  Id. at 151–152.  According to Bakri, he and Khalil listed Bakri's cousin, Ali Bakri, as the formal owner of Top Tier, but Khalil and Bakri still "call[ed] the shots" for Top Tier.  Id.  Ali

---

[12] To avoid confusion, the Court refers to Youssef Bakri as Bakri; his cousin Ali Bakri is referred to by his full name.

Bakri's testimony generally confirmed that he was not actually in control of Top Tier, and that Khalil and Bakri made most major decisions.  Tr. Vol. 17-B at 10–60.

The Government contends that Khalil and Bakri "were only concerned about making the payment structure 'look right' and not actually complying with kickback laws."  Resp. at 7 (citing Tr. Vol. 4 at 148–149).  According to the Government, Spectra's failure to follow Soltis's advice shows that Khalil was culpable.  But Soltis did not advise Khalil or Bakri that their payment structure was illegal; rather, he warned them that the structure "raises regulatory compliance concerns."  Gov. Ex. 302.  Soltis suggested a way to minimize those compliance concerns by utilizing an independent marketing company, which the evidence showed was not truly independent.

But Khalil's concerns over appearing compliant, while not losing effective control of his enterprise, does not show that Khalil knew what he was doing was illegal.  The Government had to show Khalil's actions were done "with the intent to violate a known legal duty, that is, with the intent to do something law forbids."  Jury Instruction 18(2)(B).  The Government points to no evidence—including the letter from Soltis showing that Khalil was expressly informed or otherwise understood—that his payments to marketers violated the AKS or any other law.

Finally, as already discussed, the Government's proffered interpretation of the AKS is at odds with the statutory language, and no case law has defined the statute the way the Government

is arguing for here.  It would not be fair to assume that Khalil knew that his payments to Saad and Schroeder were illegal under such a theory when no case says as much.

For these reasons, the Government has not proven that Khalil had the requisite mens rea to be convicted of Count One.  The Court grants Khalil's motion for acquittal as to this count.

### 2.  Count Two

Count Two charged Khalil and others with conspiracy to commit wire and health care fraud.  The Government's theory, on which the jury was instructed, was that the defendants conspired to commit wire and health care fraud by submitting claims to Medicare for UDT orders that were not authorized by doctors.  Jury Instruction 24.  To find Khalil guilty of this charge, the Government had to prove that: (i) Khalil and at least one other person conspired, or agreed, to commit the crime of health care fraud or wire fraud; and (ii) Khalil knowingly and willfully joined the conspiracy.  Jury Instruction 25.  Khalil concedes that the evidence was sufficient to prove that Spectra billed some UDT orders to Medicare that were not authorized by physicians, Mot. at 15, but that the evidence was insufficient to show that he was aware of these unauthorized orders.  Mot. at 8.  The Court agrees.

In its response, the Government points to certain evidence purporting to establish Khalil's knowledge of these unauthorized tests.  Resp. at 11–16.  But the evidence the Government cites only shows that Khalil had the financial incentive to bill as many comprehensive tests to Medicare as possible and that he encouraged his team to do so.  The evidence does not show that Khalil was aware that his marketers resorted to illegal means to obtain comprehensive tests.  The Court discusses each piece of evidence in turn, finding that none of the evidence was sufficient to show that Khalil knew of the unauthorized orders.

### a.  Kurt Schroeder

The Government cites various pieces of evidence related to Schroeder, Khalil's co-conspirator who testified at trial.  Much of this evidence surrounds Schroeder's use of a signature stamp on UDT orders.  Resp. at 12–13.  Dr. Ghosh—the former medical director of CPMC from 2014 to 2019—testified that he did not authorize use of a stamp bearing his signature to sign comprehensive UDT orders.  Resp. at 12 (citing Tr. Vol. 11-A at 44–45 (Dkt. 303)).  Dr. Ghosh explained that he authorized Harris to create and use a signature stamp with his name on it for imaging requests such as MRI or CT scans, but not UDT orders.  Tr. Vol. 11-A at 44.  Dr. Ghosh did not mention Khalil in his testimony at all, other than to say he may have met Khalil at some point in 2014 or 2015, but that he did not remember the encounter in detail.  Id. at 33–35; Tr. Vol. 12-B at 34–35 (Dkt. 306).

At trial, Schroeder admitted to using Dr. Ghosh's signature stamp on "thousands" of UDT orders without obtaining Dr. Ghosh's permission.  Tr. Vol. 9 at 42–43 (Dkt. 300).  The Government tried to establish Khalil's knowledge of this plan by pointing to Schroeder's testimony that Khalil directed him to obtain comprehensive UDT orders.  Mot. at 13 (citing Tr. Vol. 9 at 28–29, 44, 190).  Schroeder testified that before he was hired by Spectra, Khalil told Schroeder that his job would be to "focus[] on pain management clinics . . . who had a high volume of testing and then we would focus on comprehensive testing."  Tr. Vol. 9 at 22.  He testified that Khalil explained that comprehensive testing "reimburses at the highest rate" and "was the most thorough."  Id. at 22.  Later, when Khalil trained Schroeder on how to fill out UDT requisition forms, Khalil told Schroeder "[t]o make sure comprehensive was checked off [on the form] and that it had a doctor's signature."  Id. at 33.

But nothing in Schroeder's testimony implies that Khalil told him to "make sure comprehensive was checked off" regardless of whether a doctor authorized the test. If anything, Khalil's direction to "make sure" the form "had a doctor's signature" cuts against the Government's argument that Khalil had knowledge of unauthorized tests. Khalil's direction to Schroeder cannot be reasonably interpreted as instructing Schroeder to use a physician stamp without authorization.

The Government also points to text messages between Saad and Schroeder regarding the signature stamp. Resp. at 13 (citing Gov. Ex. 536). The text messages, which were exchanged over the course of a few hours on October 15, 2015, read as follows:

> Schroeder: I spoke with [Harris] she said she's got about 70 samples waiting to go out what's slowing her down is getting the doctor to sign all the req forms he's just dragging his feet.
> . . .
>
> Saad: Ok I'll ask [Khalil] and see if they can use a stamp.
>
> Schroeder: If that was possible that would be awesome.
>
> Saad: I'm on it.
>
> Saad: They can use stamps.

Gov. Ex. 536 at 1235–1236.

The Government contends that these messages show that Khalil was aware of and approved of use of the stamp. Resp. at 13. That much is true. But on their face, the text messages do not show that Khalil approved of use of the stamp without Dr. Ghosh's knowledge. At trial, Schroeder confirmed that he understood Saad's text messages to mean that Khalil approved of use of the stamp on orders -- not that Khalil approved of Schroeder authorizing comprehensive UDT himself. Tr. Vol. 10-B at 24. He further confirmed that "[i]t was always understood that these orders . . . were orders that Dr. Ghosh intended . . . even if [Dr. Ghosh] did not personally sign the requisition

forms." Id. at 25.  He also testified that he never personally spoke with Khalil about the stamp. Id. at 27.

Although not mentioned in the Government's briefing, Schroeder also testified to occasionally filling in the diagnostic code himself if that field was left blank on a UDT order form. Id. at 33–36.  He explained that he would check "comprehensive" on the form without checking the patients' medical file or talking to Dr. Ghosh because "it was the same diagnostic code every time." Id. at 33.  But he confirmed that he did not tell Saad or Khalil that he was doing so, and that he "never had any agreement with [Saad] or [Khalil] to falsify testing orders." Id. at 36.

The Government's argument that Khalil "did not direct [Schroeder] to get permission from Dr. Ghosh that every single order should be comprehensive," Resp. at 13 (citing Tr. Vol. 9 at 21), is unpersuasive.  The fact that Khalil did not direct Schroeder on how to follow the law, specifically, does not establish Khalil's knowledge that Schroeder broke the law.

The Government next cites testimony related to loans Spectra allegedly gave to CPMC to keep CPMC financially afloat.  Resp. at 13 (citing Tr. Vol. 9 at 101–106; Gov. Ex. 536; Gov. Ex. 533).  But the Government does not explain how these loans relate to unauthorized orders, let alone Khalil's knowledge of the unauthorized orders.

Lastly, the Government cites testimony showing that "Schroeder personally met with [Khalil] in Florida while [Khalil] was on vacation with his family."  Resp. at 13 (citing Tr. Vol. 10-A at 59; Def. Ex. 1150).  After the meeting, Khail sent Schroeder a text message which stated, "I really enjoyed our conversation and hope we continue to talk to add more value and growth to our business." Id. at 13–14 (citing Def. Ex. 1150).  Puzzlingly, the Government does not attempt to explain the significance of this meeting or the text message.  The fact that Khalil and Schroeder met in person and Khalil expressed enthusiasm for continuing to work with Schroeder does nothing

19

to prove Khalil's knowledge of any unauthorized orders.  In fact, Schroeder's testimony regarding the meeting supports the opposite conclusion.  Schroeder testified that he and Khalil discussed the fact that Medicare lowering allowable rates for testing was squeezing profit margins for Spectra, but that comprehensive testing was still profitable.  Tr. Vol. 10-A at 66–67.  Schroeder testified that Khalil advised him that if doctors wanted something less than comprehensive testing, he should not recruit them as an account.  Id. at 67.  If anything, this cuts against the Government's argument that Khalil knew certain comprehensive tests were unauthorized by doctors.

The evidence clearly showed that Schroeder falsified unauthorized orders that were given to Spectra and submitted to Medicare.  But the Government points to no evidence from Schroeder's testimony showing that Khalil was aware of the unauthorized orders.

### b.  Other Physician Testimony

In addition to Dr. Ghosh, the Government cites testimony related to three other treating physicians, none of which establishes Khalil's knowledge.

The Government cites the testimony of Dr. Fadi Delly, Resp. at 12 (citing Tr. Vol. 16-B at 47 (Dkt. 313)), a physician who operated a pain management practice in Michigan and referred UDT orders to Spectra.  Dr. Delly started referring orders to Spectra in 2016 when he first opened his practice.  Tr. Vol. 16-B at 41–42.  His insurance broker happened to be Saad's brother, who introduced Delly to Saad.

The Government argues that "Dr. Delly and his office manager Ashton Boss testified that a Spectra marketer falsely stated to the office staff that Dr. Delly wanted all tests to be comprehensive."  Resp. at 12 (citing Tr. Vol. 16-B at 47).  That is not fully accurate, as the cited transcript does not reflect that Dr. Delly testified that a Spectra marketer falsely told Dr. Delly's staff that he wanted all tested to be comprehensive.  However, Boss did testify that Saad trained

20

her to check comprehensive on all requisition forms and affirmed that she "understood [ ] Saad to be relaying Dr. Delly's preferences for urine drug testing[.]"  Tr. Vol. 17-A at 92 (Dkt. 314).  A reasonable juror could infer from this testimony that Saad falsely told Boss—or at least implied—that Dr. Delly wanted comprehensive testing.

But this testimony does nothing to establish Khalil's knowledge of Saad's actions or the unauthorized tests.  In fact, Dr. Delly testified that his interactions with Spectra were through Saad and that he had never spoken with Khalil, id. at 56, and Boss testified that she had never heard Khalil's name before, Tr. Vol. 17-A at 101.  The Government points to no evidence showing that Khalil knew Saad obtained unauthorized orders bearing Dr. Delly's signature.

The Government additionally cites the testimony of Dr. Raed Haddad, an internal medicine doctor in Michigan.  Resp. at 12; see Tr. Vol. 19-A at 15–18 (Dkt. 317).  Dr. Haddad testified that his practice started using Spectra for UDT in 2015 after someone from Spectra approached his office.  Tr. Vol. 19-A at 28–29.  His employee Ahlam Hussein was responsible for communicating with Spectra.  Id. at 35–36.  After roughly one year of working with Spectra, Dr. Haddad received a utilization report that alerted him to higher expenditures attributed to Spectra than he expected.  Id. at 37–38.  He told Hussein to immediately stop sending any testing to Spectra.  Id.

Dr. Haddad could not recall whether he ever discussed testing panels (basic, standard, and comprehensive) with any Spectra representative, but he testified that he would have had no reason to order comprehensive panels for his patients.  Id. at 31–32.  He testified that he did not require any of his patients obtain UDT at regular intervals.  Id. at 32.  Dr. Haddad testified that he reviewed a series of nine comprehensive UDT orders for a particular patient bearing his signature that he said he did not authorize.  Id. at 39–45.  He further testified to having reviewed all 1,402 pages in Government Exhibit 404, which contains roughly 700 Spectra requisition forms purporting to be

signed by Dr. Haddad.  Id. at 45–46.  Dr. Haddad testified that he did not authorize any of the orders.  Id. at 46.  He testified that he did not know how these fraudulent orders were created—whether by someone at his office or someone at Spectra, but he did not suspect anyone at his office at the time.  Id. at 66–67.  The Government notes that Dr. Haddad's compensation from insurance companies was tied to the avoidance of unnecessary tests, so he had no incentive to order unnecessary comprehensive urine drug tests for his patients.  Resp. at 12.  Even so, this does not show who was responsible for the unauthorized tests, much less that the person responsible was Khalil.

Dr. Haddad's testimony establishes that Spectra submitted unauthorized tests to Medicare bearing Dr. Haddad's signature.  But again, Khalil is not linked to this testimony.  Dr. Haddad did not identify the Spectra employee he met with, and he later testified that he had never met Khalil.  Id. at 47.  Nothing in Dr. Haddad's testimony shows that Khalil was aware of the unauthorized orders.

In addition, the Government cites Bakri's testimony that Amira El Khazen, a marketer for Spectra, paid a receptionist at Dr. Haddad's practice $20 for every UDT order that Spectra received.  Resp. at 14 (citing Tr. Vol. 4 at 118).  Bakri's exact testimony was that "there was a lady that worked at [Dr. Haddad's] office and she used to give the reception 20 dollars per cup."  Tr. Vol. 4 at 118.  Bakri confirmed that the "cup[s]" were orders for UDT that Spectra billed to insurers, including Medicare.  Id.  Barki testified that El Khazen was paid a percentage of these reimbursements and affirmed that Khalil authorized "the payments to [El Khazen] for arranging the physician orders from the doctor's office."  Id.  But Bakri did not testify that Khalil knew about the $20 payments supposedly made to Dr. Haddad's receptionist.

The Government cites a May 2016 email exchange between Bakri and Khalil where Khalil

listed six doctors whose "accounts are not performing as usual," including Dr. Haddad.  Resp. at 14 (citing Gov. Ex. 124).  Bakri responded by saying "Haddad no more he gas (sic) a crazy receptionist."  Gov. Ex. 124.  The Government contends that this "demonstrates [Bakri's] mutual understanding with [Khalil] that the receptionist was being bribed to provide samples which were not ordered by Dr. Haddad."  Resp. at 14.  The Government does not support its argument that this email exchange could reasonably be interpreted in this manner.  The email exchange implies nothing about bribes or unauthorized orders.

The Government next cites the testimony of Lisa Bailey-Ruettinger—the widow, nurse, and office manager of Dr. H. Rex Ruettinger, an internal medicine doctor in Michigan.  Resp. at 12–13; Tr. Vol. 18 at 89–90.  Bailey-Ruettinger testified that her late husband's practice started using Spectra for its UDT in 2015 after a Spectra representative visited the office.  Id. at 93. Bailey-Ruettinger spoke with a representative named Hussein Hider and one other individual from Spectra, but she could not recall the other individual's name.  Id. at 94.  She could not recall if Dr. Ruettinger spoke with anyone from Spectra regarding what type of lab panel he wanted to order for his patients, but her impression from her own conversations with her late husband was that he intended to request basic panels.  Id. at 97–98.  Eventually, Dr. Ruettinger hired a collector from Spectra named Jamal Beidoun who worked out of Dr. Reuttinger's office and was responsible for filling out UDT requisition forms.  Id. at 99.  Beidoun had access to the medical office's records and computer system.  Id. at 100.  At some point, after speaking with an insurance carrier, Bailey-Ruettinger became concerned that the office was ordering more UDT than they expected, and that they were ordering comprehensive tests instead of basic.  Id. at 108.  Bailey-Ruettinger and Dr. Ruettinger conducted an audit of their own and confronted Beidoun about all the comprehensive tests.  Id. at 112–113.  Beidoun responded by saying she thought that was what the practice wanted.

23

Id. at 112.  Shortly thereafter, Dr. Ruettinger told Hider that he did not want Beidoun working out of his office anymore.  Id. at 113.  His practice continued to use Spectra for its UDT for approximately one more month.  Id.

Again, the problem with the Government's reliance on this testimony is that it does not establish Khalil's knowledge.  Although Bailey-Ruettinger testified about speaking with Hider, Beidoun, and one other Spectra employee whose name she could not remember, she said that she had never met Khalil before.  Id. at 114.  None of Bailey-Ruettinger's testimony related to Khalil whatsoever.  Even if Dr. Reuttinger did not authorize the comprehensive UDT that Spectra billed for, there is no evidence that Khalil was aware of the unauthorized tests.

### c.  Ali Bakri

The Government additionally relies on testimony from Ali Bakri.  Resp. at 14.  According to the Government, Ali Bakri "corroborated that [Khalil] closely tracked the number of samples coming from each doctor and directed any low-performing doctors be removed as Spectra clients." Id.  The Government also notes that Ali Bakri "indicated that [Khalil] conducted training sessions with marketers, instructing them to focus on acquiring comprehensive test orders, but never training them to collect medical records with the orders."  Id.  But the Government does not explain how this testimony shows Khalil knew Spectra submitted any unauthorized orders to Medicare. Focusing on doctors with a higher volume of UDT does not equate to knowledge that any orders were falsified or not actually authorized by a doctor.  And the fact that Khalil did not train

marketers to collect medical records does not establish that Khalil knew any unauthorized tests would be submitted.

### d. Amber Mayo

Next, the Government points to the testimony of Amber Mayo, a representative of Medicare contractor Noridian.  Resp. at 15.  Noridian's role was to review medical documentation and educate providers on billing and documentation requirements.  Tr. Vol. 6-B at 82 (Dkt. 296).  Mayo testified regarding three audits Noridian conducted of Spectra.  Tr. Vol. 7-B at 30, 33, 51.  Mayo testified that Spectra's error rate across three rounds of audits was 100%.  Id.  The top reason for the error rate was insufficient documentation from the medical provider supporting each order.  Id. at 30.  Mayo testified that Noridian informed Spectra of the results from each audit by sending a "findings letter" at the end of each round.  Id. at 29.  Nonetheless, Spectra's error rate did not decline in the second and third audits.  Id.  The Government also points to various exhibits showing that Khalil received education and training from Noridian regarding the appropriate standards for UDT, including an email Noridian sent to Khalil in 2018 with an attachment containing a presentation on "Drugs of Abuse Testing."  Resp. at 15 (citing Def. Ex. 1034).

In his motion, Khalil admits that he was aware of the results of Noridian's audits but argues that this evidence is not sufficient because Noridian's audits found that Spectra had not provided sufficient documentation to establish medical necessity—not that the orders billed by Spectra to Medicare had not been authorized by doctors.  Mot. at 9–10.

The Court agrees that this is a critical distinction.  Because the Government's theory of Count Two relies on unauthorized orders, Mayo's testimony and the exhibits related to Noridian's audit do not establish Khalil's awareness of facts essential to sustain the Government's case.

### e. Andrea Castronova

Lastly, the Government cites the testimony of Andrea Castronova, a private compliance officer hired by Spectra in 2018.  Resp. at 15–16 (citing Tr. Vol. 14 at 107–108 (Dkt. 309)).  Castronova owns a compliance company, Athena Compliance Partners.  Tr. Vol. 14 at 97.  Attorney Keith Soltis put Castronova in touch with Spectra.  Id. at 106.  Soltis told Castronova that based on his discussions with Spectra, he believed their "contracts and structure [were] appropriate," but Soltis "thought someone should review as there are a number of issues with [] toxicology labs."  Id. at 107.  Castronova testified that she interacted with Saad, Khalil, and Abdelsayed, and attended site visits of the lab.  Id. at 109–110, 115.  She drafted compliance policies and procedures for Spectra, including a new requisition form for UDT and a code of conduct.  Id. at 127–128, 131.  Castronova explained that she put a code of conduct in place as part of every compliance program she created.  Id. at 130.  The code of conduct for Spectra warned that submitting false or misleading claims to the Government was prohibited.  Id. at 132.  But the Government points to no testimony where Castronova told Khalil that Spectra was submitting UDT based on false or misleading claims.

The Government argues that "despite being made aware of significant deficiencies, [Khalil] made no efforts to implement a compliance program as recommended by Castronova."  Resp. at 16 (citing Tr. Vol. 14 at 77–78; Gov. Ex. 685).  But the Government's citation to the transcript in support of this statement is incorrect—the pages cited contain the testimony of a different witness, not Castronova.  Nonetheless, failing to implement a recommended compliance plan is not evidence that Khalil knew about any unauthorized orders.

The Government also cites a letter from Ashlie Heald, an associate of Castronova, to Khalil in 2019.  Gov. Ex. 685.  The letter states that Athena Compliance Partners performed an "audit of

appropriate documentation for requested [UDT]" as part of the Spectra compliance program." <u>Id.</u>
The letter explains that of the 30 claims reviewed, only eight had additional documentation
available for review, "most of which was insufficient to support the requested testing." <u>Id.</u>  The
letter also flagged that nine of the claims were "identified as potentially problematic based on the
panel and risk group selected in the requisition." <u>Id.</u>  Athena drafted a letter to those physicians,
"notifying them that ordering those tests outside the approved testing frequency is inappropriate."
<u>Id.</u>  The letter said nothing about tests not authorized by physicians.

In summary, the Government points to no evidence showing that Khalil was aware that
Spectra was submitting UDT claims to Medicare that were not authorized by doctors.  Because a
rational juror could not find that Khalil had the requisite mens rea, the Court grants Khalil's motion
of acquittal as to Count Two.

### B. Motion for New Trial

While Khalil's alternative motion for a new trial would appear moot, Rule 29(d) requires a
court that enters a judgment of acquittal to conditionally determine whether a motion for new trial
should be granted if the acquittal determination is later vacated or reversed.  The Court explains
below why it conditionally denies the motion for a new trial.

Rule 33(a) enables "the court [to] vacate any judgment and grant a new trial if the interest
of justice so requires."  Fed. R. Crim. P. 33(a).  "A motion for a new trial under Rule 33 . . . may
be premised upon the argument that the jury's verdict was against the manifest weight of the
evidence."  <u>United States v. Hughes</u>, 505 F.3d 578, 592 (6th Cir. 2007).  "A reversal based on the
verdict being against the manifest weight of the evidence is proper when the government has
presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of
conflicting evidence."   <u>United States v. Lutz</u>, 154 F.3d 581, 589 (6th Cir. 1998).   "When

considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a thirteenth juror and consider the credibility of the witnesses and the weight of the evidence to [e]nsure that there is not a miscarriage of justice." Id. (punctuation modified).  A district court should exercise its discretion to overturn a jury's verdict "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." United States v. Pierce, 62 F.3d 818, 825 (6th Cir. 1995) (punctuation modified).  Serious legal error is another recognized basis for a new trial.[13] United States v Munoz, 605 F.3d 359, 373 (6th Cir. 2010).

Khalil moves for a new trial for three reasons.  First, Khalil renews the arguments he made in his pretrial motions to dismiss Counts One and Two, which the Court denied.  Mot. at 21–22.  As explained above, the Court's pretrial opinion reviewed the arguments under the standard for evaluating a challenge to an indictment: whether the indictment set forth the elements of the offense, fairly informed the defendant of the charge, and provided sufficient specificity to allow him to plead an acquittal or conviction as a bar to a future prosecution. Khalil, 2024 WL 3160312, at *6.  Khalil offers no new arguments for challenging the Court's conclusion that the indictment satisfied the prerequisites for a proper indictment.  Further, now that a trial has taken place, and the Court has found the Government's proofs lacking, there is no basis for granting a new trial based on alleged infirmities with the indictment.  Should there be a Government appeal of the judgment of acquittal that results in a reversal of this judgment, there would be no basis for a new trial premised on alleged defects in the indictment.

Second, Khalil argues that the weight of the evidence does not support the jury's finding that Khalil had the requisite mens rea on either count.  Mot. at 22.  In granting Khalil's  motion for

---

[13] So is newly discovered evidence, see United States v. Olender, 338 F.3d 629, 635 (6th Cir. 2003)—a basis not asserted by Khalil.

acquittal, the Court has found that the Government presented insufficient evidence to convict.  But that conclusion was based on a failure of proof by the Government, not a jury's disregard or rejection of defense witnesses and evidence.  Should there be an appeal that results in a reversal of the acquittal, this Court sees no basis for granting a new trial based on the theory that the jury's verdict was against the great weight of the evidence.

Third, Khalil contends that the prosecutor made an improper argument during his rebuttal argument.  Id. at 22–23.  Specifically, Khalil takes issue with the prosecutor's statement that certain evidence of incomplete UDT orders was the "tip of the iceberg."  Id.  According to Khalil, "[t]his argument was improper because it vouched for the thoroughness of the government's investigation and suggested that there was additional evidence of Khalil's guilt that was not presented to the jury."  Id.  But as the Government explained in its response, Resp. at 21, Khalil misconstrues the prosecutor's statement.  The prosecutor's reference to the "tip of the iceberg" was referring to the specific examples of alleged fraud presented explicitly during trial, in the context of other examples discussed more summarily by other witnesses.  Khalil unfairly characterizes this as suggesting there existed additional evidence that was not presented to the jury.  However, a fair interpretation of the metaphor is that the central evidence presented at trial was corroborated by other trial evidence that had not been as thoroughly discussed.  This presents no ground for a new trial.

### III.   CONCLUSION

For these reasons, Khalil's motion for judgment of acquittal (Dkt. 343) is granted as to Count One and Count Two.  Khalil's alternative motion for a new trial is conditionally denied.

**SO ORDERED.**

Dated: July 11, 2025       s/Mark A. Goldsmith
Detroit, Michigan        MARK A. GOLDSMITH
               United States District Judge

## CERTIFICATE OF SERVICE

   The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 11, 2025.

               s/Joseph Heacox
               JOSEPH HEACOX
               Case Manager